IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

AW DYNAMOMETER Inc,
    Plaintiff,

v.

SHOP DOG INDUSTRIES LLLP,
    Defendant.

Case No. 1:24-cv-01469-JEH-RLH

**Order**

    Now before the Court is the Defendant's Motion to Dismiss (D. 14).[1] For the reasons stated, *infra*, the Motion is DENIED. The Court hereby reconsiders the previous Order made by the former presiding judge denying consolidation and GRANTS the Motion to Transfer the Case (D. 6). The instant case shall be transferred and deemed consolidated with *AW Dynamometer, Inc. v. Folkers et al*, No. 1:23-cv-01352-JEH-RLH, (C.D. Ill. 2023). The Clerk is directed to consolidate the cases and all future filings should be made in *AW Dynamometer, Inc. v. Folkers et al*, No. 1:23-cv-01352-JEH-RLH, (C.D. Ill. 2023).

**I**

    On October 4, 2024, Plaintiff, AW Dynamometer Inc. ("AW"), filed its Complaint against the Defendant, Shop Dog Industries LLLP ("Shop Dog"), in the Circuit Court for the Eleventh Judicial Circuit of Illinois. (D. 1-1 at ECF p. 1). The Defendant subsequently filed its Notice of Removal to the United States District Court for the Central District of Illinois on November 20, 2024. (D. 1). On December 19, 2024, the Defendant filed a Motion to Dismiss (D. 7) and the Plaintiff

---

[1] Citations to the electronic docket are abbreviated as "D. ___ at ECF p. ___."

1

filed its Response on January 6, 2025. (D. 10). On May 6, 2025, the Court granted the Defendant's Motion to Dismiss and granted the Plaintiff leave to amend the Complaint within fourteen days. *See* 05/06/2025 Text Order. The Plaintiff filed its Amended Complaint on May 20, 2025, (D. 13), and the Defendant filed a Motion to Dismiss on June 3, 2025. (D. 14). The Plaintiff filed its Response on June 17, 2025, (D. 15), and the matter is now fully briefed.

II

According to the Complaint, "AW is engaged in the business of designing, manufacturing, selling, and servicing dynamometers throughout the United States and the world." (D. 13 at ECF p. 2). "A dynamometer is a device used for measuring the torque and rotational speed of an engine, electric motor, or tractor power takeoff." *Id.* "Typical purchasers of dynamometers are agricultural dealerships and repair shops . . .." *Id.* As part of its business, AW utilizes "independent contractors to make its service calls" and shares with them its "proprietary design, diagnostic information, customer information, and know-how . . . so they can perform the requisite services." *Id.* at ECF p. 3. Following service calls, AW produces a "Service Call Sheet" ("Call Sheet") that contains, among other things, "the contact name(s) and contact information for each AW Dyno customer and service representative, the model and make of any dynamometer owned, possessed, or otherwise used by that customer, and all prior sales and service information regarding that customer and products sold or serviced by AW Dyno." *Id.* AW states that it protects the integrity of its Call Sheets by (1) providing access on a need-to know-basis that included only a "select few AW Dyno employees" and saving them "digitally onto a separate and independent server to which only those select employees have access"; (2) instructing employees and contractors that Call Sheets must be returned after services have been performed; (3) entering into technician service agreements with

2

independent contractors that require them to provide AW with all documentation related to the service call and to return all materials belonging to AW upon termination of the relationship, including the Call Sheets; (4) entering into agreements with its independent contractors that limit the independent contractor's ability to solicit business from past, present, or future clients of AW; (5) protecting information on its own servers with password walls; and (6) hiring a specialized security firm to assist in keeping its information secure. *Id.* at ECF p. 3-4. AW also states that, in 2018, it attempted to enter a business relationship with Shop Dog, a company that manufactures a complementary product, but that "after negotiations were not successful," AW sought to "manufacture an alternative product" known as the "Virtual Tractor." *Id.* at ECF p. 4-5.

Around the same time, in May of 2018, AW began an independent contractor relationship with Michael Folkers ("Folkers") and executed a Technician Service Agreement ("TSA"). *Id.* at ECF p. 5. The parties subsequently executed a second contract in June 2022 when Folkers began doing business under a new name. *Id.* AW alleges that it provided Folkers with access to the Call Sheets, "including a proprietary listing of AW Dyno customers" that contained details about the customers' business history with AW. *Id.* As part of that relationship, AW asked Folkers to attend tradeshows as their lead representative and "discussed highly confidential research and development projects" which included AW's desire to develop the Virtual Tractor that it alleges would directly compete with Shop Dog. *Id.*

In February of 2023, Folkers terminated his relationship with AW. *Id.* at ECF p. 6. AW alleges that Folkers notified them the termination was to pursue "an interest in managing a landscaping business", but that on the same day he resigned he "entered into a business agreement with Shop Dog", and executed an independent contractor agreement to that effect. *Id.* AW also alleges that while he

3

was still under contract with AW, Folkers engaged in negotiations with Shop Dog wherein Folkers "would utilize AW Dyno's proprietary Service Call Sheets to compete with AW Dyno's Virtual Tractor just as it was ready to hit the market." *Id.* AW states that it requested the return of the Call Sheets and service routes upon the termination of Folkers' contract, but claims he did not return the information pursuant to the TSA, claiming the information belonged to him because he logged the information into his own system. *Id.* AW alleges Folkers subsequently provided Shop Dog with the Call Sheets and pursued "an aggressive sales campaign on behalf of Shop Dog" to "sell the Shop Dog product" to AW customers and thereby preempt the Virtual Tractor product before it entered the market. *Id.* at ECF p. 7. AW alleges Folkers and Shop Dog benefited from the alleged conduct. *Id.* AW claims Folkers and Shop Dog "utilized trade secrets, such as information related to the Virtual Tractor and Service Call Sheets" to "service or sell dynamometers of another brand" to AW's customers "which gave Shop Dog an improper and unlawful advantage in competing with Virtual Tractor." *Id.* In response to this alleged conduct, AW filed the instant Complaint alleging the Defendant violated the Defend Trade Secrets Act, the Illinois Trade Secrets Act, and Tortious Interference With Prospective Economic Advantage. (D. 13 at ECF p. 7-13). The Defendant has moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (D. 14 at ECF p. 2).

### III

Federal Rule of Civil Procedure 12(b)(6) governs whether a complaint fails to state a claim. FED. R. CIV. P. 12(b)(6). Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663. A plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (2007)). Similarly, a complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Id.*

**A**

In Count One, the Plaintiff alleges that Shop Dog misappropriated AW's trade secrets in violation of the Defense of Trade Secrets Act ("DTSA"). (D. 13 at ECF p. 8). In Count Two, the Plaintiff similarly alleges that Shop Dog violated the Illinois Trade Secrets Act ("ITSA"). *Id.* at ECF p. 11. For purposes of ruling on the Defendant's Motion to Dismiss, the Court considers the two Counts together "because the elements of a claim arising under those statutes are the same." *Allstate Ins. Co. v. Ameriprise Fin. Serv. Inc.*, 2023 WL 5334683, at *11 (N.D. Ill. 2023) (citing *Next Payment Sols., Inc. v. CLEAResult Consulting, Inc.*, 2019 WL 955354, at *72 n.13 (N.D. Ill. 2019)).[2] Under either, a Plaintiff "must show (1) the existence of a trade secret, and (2) that the defendant misappropriated that trade secret." *Allstate Ins. Co.*, 2023 WL 5334683, at *11.

Under the DTSA, a trade secret is defined in relevant part as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information,

---
[2] The parties agree that "Illinois courts commonly interpret the [ITSA] and the [DTSA] similarly, given the overlapping and common elements shared under both laws." (D. 10 at ECF p. 2 n.1).

5

> including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1893(3).

Under the ITSA, a trade secret means:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that:
> (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILL. COMP. STAT. § 1065/2(d).

In this case, the crux of Plaintiff's DTSA claim is that the Defendant misappropriated AW's trade secrets "in the form of its Service Call Sheets and is using such trade secrets in connection with its efforts to compete with AW Dyno in the dynamometer and virtual tractor industries." (D. 13 at ECF p. 9). Similarly, the crux of Plaintiff's ITSA claim is that "Shop Dog acquired AW Dyno's trade

secrets . . . [by] using AW Dyno's Service Call Sheets after Michael Folkers's authority to receive, possess, or otherwise use those Service Call Sheets terminated . . ..." *Id.* at ECF p. 11.[3]

"To establish a protectable trade secret under either statute, the party seeking protection must show that the information: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." *Inmar Inc. v. Vargas*, 2018 WL 6716701, at *3 (N.D. Ill. 2018) (citing *PrimeSource Bldg. Prod., Inc. v. Huttig Bldg. Prod., Inc.*, 2017 WL 7795125, at *13 (N.D. Ill. 2017)). In short, Plaintiff alleges the Call Sheets that its independent contractors produce following service calls constituted trade secrets, and that Shop Dog misappropriated them by using them to compete "unlawful[ly]" with AW. (D 13 at ECF p. 7). In response, the Defendant argues that AW "fails to sufficiently allege it employed reasonable measures to protect the confidentiality of its Service Call Sheets as required under the DTSA and the ITSA." (D. 14 at ECF p. 11).

"The existence of a trade secret ordinarily is a question of fact." *Learning Curve Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003). "A trade secret 'is one of the most elusive and difficult concepts in the law to define.'" *Id.* (citing *Lear Siegler, Inc. v. Ark-Ell Springs, Inc.*, 569 F.2d 286, 288 (5th Cir. 1978)). "In many cases, the existence of a trade secret is not obvious; it requires an ad hoc evaluation of all the

---

[3] The Court does not believe Plaintiff is claim that "information related to the Virtual Tractor project" was misappropriated in violation of Count One or Two as Defendant maintains. (D. 14 at ECF p. 10). The Court discussed this in its previous Order (D. 12 at ECF p. 9), moreover the Plaintiff states in its response that "the trade secrets claims relate to Folkers' transmission of the Service Call Sheets, the tortious interference claim relates to Shop Dog's possession of trade secrets *and* *other* *sensitive* *information* . . .." (D. 15 at ECF p. 7) (emphasis in original) (internal citations omitted).

surrounding circumstances." *Id.* Such is the case here. In certain circumstances, customer lists and data can qualify as a trade secret. *Id.* at 728 n.8. Several cases also emphasize the developmental costs associated with data compilation and customer lists, not unlike the Call Sheets at issue in this case. *Id.* Here, the Call Sheets are produced following a service call by an AW employee, independent contractor, or other AW agent. (D.13 at ECF p. 3). These Call Sheets contain, among other things, "the contact name(s) and contact information for each AW Dyno customer and service representative, the model and make of any dynamometers owned, possessed, or otherwise used by that customer, and all prior sales and service information regarding that customer and products sold or serviced by AW Dyno." *Id.* Given that background, at the Motion to Dismiss stage, the Court finds that it is plausible the Calls Sheets had value as both companies are competing for similar market customers such that AW could have been damaged by Shop Dog's receipt of the Call Sheets. Plaintiff states the Call Sheets reflected each customer's service history and relationship with AW (D. 10 at ECF p. 3) and that the information contained therein is not publicly accessible. In that sense, the information is not "generally known" or "readily available to competitors." *See Learning Curve Toys, Inc.*, 342 F.3d at 722; *Archer Daniels Midland Co. v. Sinele*, 139 N.E.3d 1036, 1045 (Ill. App. Ct. 2019) (discussing information easily obtained from telephone directories, chamber of commerce directories, the Internet, and a variety of sources, do not qualify as a trade secret). Therefore, the Plaintiff has met the first element of a protectable trade secret.

The Defendant challenges the second element—that the Plaintiff did not take reasonable measures to maintain the secrecy of the Call Sheets. (D. 14 at ECF p. 11-13). In response, the Plaintiff claims it took the following steps to protect the Call Sheets by (1) providing access on a need-to know-basis that included only a "select few AW Dyno employees" and saving them "digitally onto a separate and

independent server to which only those select employees have access"; (2) instructing employees and contractors that Call Sheets must be returned after services have been performed; (3) entering into technician service agreements with independent contractors that require them to provide AW with all documentation related to the service call and to return all materials belonging to AW upon termination of the relationship, including the Call Sheets; (4) entering into agreements with its independent contractors that limit the independent contractor's ability to solicit business from past, present, or future clients of AW; (5) protecting information on its own servers with password walls; and (6) hiring a specialized security firm to assist in keeping its information secure. (D. 13 at ECF p. 3-4). Plaintiff also states that it asked Folkers to return information related to the Call Sheets upon the termination of their agreement. *Id.* at ECF p. 6. The Defendant argues that the TSA "establishes no such obligation to return the 'Service Call Sheets'", but, at this stage, the Court is under an obligation to accept Plaintiff's allegation to the contrary as true. *See Ashcroft*, 556 U.S. at 678. Moreover, the Defendant concedes the TSA agreement states that, upon termination, "within thirty (30) days all . . . other materials belonging to us are to be returned." (D. 14 at ECF p. 11). Still the Defendant maintains that because AW does not allege Folkers signed a confidentiality agreement, mark the Call Sheets as confidential, or prohibit Folkers from keeping his own copies of the Call Sheets, that Plaintiff does not allege reasonable security measures. (D. 14 at ECF p. 13). However, Plaintiff alleges employees are instructed to return the Call Sheets after services are performed and, at any rate, Plaintiff need not deploy all the security measures Defendant supposes Plaintiff should have, just reasonable ones. *Inmar Inc.*, 2018 WL 6716701, at *3. Only in "'an extreme case can what is a 'reasonable' precaution be determined . . . because the answer depends on a balancing of costs and benefits that will vary from case to case.'" *Learning Curve Toys, Inc.*, 342 F.3d at 725 (quoting

*Rockwell Graphic Sys., Inc. v. DEV Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991)). Moreover, in this case, the Plaintiff has alleged that the TSA agreement requires the return of the Call Sheets, not unlike the function of a confidentiality agreement, and that access to the Call Sheets was allegedly provided on a need-to-know basis. *See Liebert v. Mazur*, 827 N.E.2d 909, 923 (Ill. App. Ct. 2005) (observing restricting access on a need-to-know basis weighed in favor of reasonable measures). At the Motion to Dismiss stage, that is enough. Accordingly, the Defendant's Motion to Dismiss Counts One and Two is denied.

B

In Count Three, AW pleads tortious interference with prospective economic advantage, an Illinois common law cause of action. (D. 13 at ECF p. 12-13). In response, the Defendant contends that Plaintiff's claim is preempted by the ITSA. (D. 14 at ECF p. 13-14). For the reasons that follow, the Court agrees with the Plaintiff that, at this stage, Count Three cannot be dismissed on preemption grounds.

The ITSA states, "this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret." 765 ILL. COMP STAT. § 8(a). It also states the ITSA does not affect "other civil remedies that are not based upon misappropriation of a trade secret." 765 ILL. COMP STAT. § 8(b)(2). The Seventh Circuit has adopted the view that "claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets." *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404-05 (7th Cir. 2005). The Defendant maintains that because AW "brings a claim under the ITSA, its common law claim for tortious interference with prospective economic advantage based upon the alleged misappropriation of a trade secret is preempted and must be dismissed." (D. 14 at ECF p. 14). However, the Plaintiff alleges more than conduct resting solely on the

misappropriation of trade secrets. Plaintiff states its claim rests on other sensitive information, including its Virtual Tractor product and other "highly confidential research and development projects with Folkers" that "led to Shop Dog's unlawful interference with" AW's expectation to enter the market. (D. 15 at ECF p. 6-7). Consistent with that argument, the Seventh Circuit has observed, "it is unimaginable that someone who steals property, business opportunities, and the labor of the firm's staff would get a free pass just because none of what he filched is a trade secret." *Hecny Transp., Inc.*, 430 F.3d at 404. Accordingly, the Court denies the Motion to Dismiss Count Three.

## IV

For the reasons stated, *supra*, the Defendant's Motion to Dismiss (D. 14) is DENIED. The Court hereby reconsiders the previous Order made by the former presiding judge denying consolidation and GRANTS the Motion to Transfer the Case (D. 6). The instant case shall be transferred and deemed consolidated with *AW Dynamometer, Inc. v. Folkers et al*, No. 1:23-cv-01352-JEH-RLH, (C.D. Ill. 2023). The Clerk is directed to consolidate the cases and all future filings should be made in *AW Dynamometer, Inc., v. Folkers et al*, No. 1:23-cv-01352-JEH-RLH, (C.D. Ill. 2023).

*It is so ordered.*

Entered on June 25, 2025

s/Jonathan E. Hawley
U.S. DISTRICT JUDGE